**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Sean Griffin,** | ) | **CASE NO. 1:16 CV 872** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| Vs. | ) | |
| | ) | |
| **International Union of Operating** | ) | **Memorandum of Opinion and Order** |
| **Engineers. Local 18, et al.** | ) | |
| **Defendant.** | ) | |

## Introduction

This matter is before the Court upon defendant's Motion for Summary Judgment (Doc. 25). This case alleges discrimination in employment. For the following reasons, the motion is GRANTED.

## Facts

Plaintiff Sean Griffin filed this Complaint against defendants Local 18 Ohio Operating Engineers (Local 18 or the Union) and International Union of Operating Engineers, Local 18

(IUOE).[1] Local 18 represents its members who work in the building and heavy highway construction industries in Ohio and Kentucky. Local 18 negotiates collective bargaining agreements (CBAs) which govern the terms and conditions of the members' employment. These include the CEA Building Agreement, the AGC Building Agreement, and the OCA Highway Heavy Agreement. IUOE also negotiated the National Maintenance Agreement (NMA).

The following background facts are submitted by defendant as supported by the affidavits (and supporting exhibits) of Lisa Cianciolo (the Union's Medical Review Officer) and Donald Taggart (the Union's District 1 Representative in 2013 and 2014). Local 18 maintains five district offices in Ohio, each of which is responsible for covering a specific geographic area and each maintaining a hiring hall for signatory employers seeking to hire operating engineers. The NMA also provides for the referral of operating engineers through the appropriate hiring hall. The hiring hall system operates on a "first-in, first-out" basis." Operating engineers register, indicating, *inter alia,* the type of equipment they are capable of operating. The applicant's registration card is then time- and date-stamped and placed in the referral deck. Signatory employers requiring the services of operating engineers call the appropriate Union district office indicating the type of equipment to be operated. The Union fills the work order by referring a qualified applicant who has been out of work the longest.

Construction projects are generally completed in phases, and the work is seasonal in nature. Thus, all of the Union's job referrals are temporary assignments and the employers do not always advise Local 18 once an operating engineer is discharged due to a project's completion or

---

[1] Collectively hereafter, both defendants will be referred to as "defendant." Local 18 is a local affiliate of the parent organization, the International Union of Operating Engineers, AFL-CIO.
2

lack of work. Union members usually advise the hiring hall of their unemployment and desire to re-register for employment.

Local 18's CBAs contain a nearly identical mandatory Alcohol and Drug Policy (Policy) implemented in recognition of the potentially disastrous results that drug and alcohol use can have on the job site considering the equipment being used. Under the Policy, employees may be subject to a drug test within two weeks of reporting to a job, may be subject to random drug screening at any point in their employment, and may be subject to massive drug screening at any point in their employment. Additionally, employees involved in workplace accidents or whose behavior raises suspicion of illegal drug or alcohol impairment may be subjected to a drug test (after signing a consent) as a condition of continued employment. The employer has the sole discretion as to when an employee is subject to drug testing.

Under the Policy, a positive test result will render the employee subject to disciplinary action by the employer, up to and including immediate discharge. The employee is also temporarily prohibited from registering with the hiring hall or from being dispatched to work. The employee is granted a maximum 30-day leave to complete a drug and alcohol rehabilitation program. Upon completion of the program, the employee must present a certificate of completion to the Union to be restored to work with his previous employer or to be permitted to re-register in the hiring hall. Thereafter, the employee must present a monthly certification of negative alcohol and drug tests to the Union for the next 12-month period. Failure to do so will result in the employee losing the right to maintain his registration card within the referral deck, to be dispatched to work, or to remain employed with his current employer. Under the Policy, an employee's refusal to take a mandated drug and alcohol test and/or refusal to sign a consent form

constitutes an automatic positive result. Under the CEA agreement, a third positive drug or alcohol test results in an employee being permanently barred from registering for employment in the hiring hall. Under the AGC and the OCA agreements, any positive drug and/or alcohol test after the second rehabilitation procedure will result in the employee being permanently banned from the hiring hall. The NMA contains a five step grievance and arbitration procedure which covers all disputes arising out of work performed under the agreement.

Defendant also submits the following facts regarding plaintiff's work history with the Union as supported by plaintiff's deposition (with exhibits) and answers to requests for admission, as well as the affidavits of Cianciolo, Taggart, and Steve DeLong (the Union's District 1 Representative in 2005 and 2007) with accompanying exhibits. Plaintiff graduated from a Union apprenticeship program in 1995 and remained consistently employed through the hiring hall through 2005. In August 2005, plaintiff was referred through the appropriate hiring hall to perform work covered by the OCA with Soda Construction. On August 22, 2005, he was subjected to an alcohol and drug test, and tested positive for cocaine. The Union received the results in November 2005 and immediately informed plaintiff of the results, the ramifications thereof, and the steps necessary to complete rehabilitation under the Policy. In May 2006, plaintiff successfully completed a rehabilitation program and provided the certificate to the Union. But, between May and October 2006, plaintiff only submitted two certificates of negative alcohol and drug tests. As a result, a Union representative informed plaintiff by letter of October 12, 2006 of the failure to timely submit monthly certification and that monthly certification for the next 12 months must be submitted to obtain complete rehabilitation under the Policy. Plaintiff then successfully completed a rehabilitation program in January 2007, provided a

4

certificate to the Union, and submitted certifications of negative drug tests between March and July 2007.

On August 2, 2007, plaintiff was scheduled, through the appropriate hiring hall, to begin employment with the Ruhlin Company for work covered under the OCA. On that date, the employer requested that he submit a pre-employment drug test under the Policy. He failed to do so (an automatic positive result) and left the job site. The next day, the Union representative informed plaintiff by letter that due to the failure, he was not in compliance with the Policy. Like before, plaintiff was informed of the ramifications and necessary steps to complete rehabilitation. On November 29, 2007, plaintiff successfully completed a rehabilitation program and provided the certificate. He thereafter timely submitted the 12 certificates of negative drug tests.

On September 5, 2013, Mr. Griffin was referred to employment with Glasrock-OMI through the hiring hall to perform forklift work covered by the NMA. Within a couple weeks, the Union learned that plaintiff had quit his job after a meeting with his supervisors precipitated by safety infractions committed by plaintiff including leaving his forklift running with the forks in the air, driving the forklift too fast, and wearing tinted safety glasses at night. At the meeting, plaintiff refused to sign a written warning form memorializing his infractions, became very angry at his supervisors, swore at them, and walked off the job. Plaintiff also refused to return the forklift keys to his supervisors. Shortly after quitting, plaintiff contacted the Union to report that he had been retaliated against by his supervisors for complaining about racially derogatory remarks by a co-worker. The Union drafted a grievance in that regard. Plaintiff also reported that Glasrock-OMI had failed to pay him for his final pay period prior to quitting. The Union filed this second grievance. The Union held Step 1, 2, and 3 meetings with Glasrock-OMI over the

5

discrimination and wage grievances, but the grievances were not resolved. A Step 4 grievance hearing was held before the grievance subcommittee in Washington D.C. in January 2014 as to both grievances. At the hearing, the discrimination grievance was denied, but the wage grievance was granted and plaintiff was awarded 28 hours of straight-time pay.

On July 2, 2014, plaintiff was scheduled to begin employment with Chieftain Trucking, a job he obtained through the appropriate hiring hall. On the day prior, the employer subjected plaintiff to an alcohol and drug test, pursuant to the Policy. He tested positive for cocaine. Plaintiff was again informed by letter from the Union of the test results, the ramifications of a positive drug test, and the steps necessary to successfully complete rehabilitation under the Policy. Shortly after the positive drug test, plaintiff obtained employment with a Union signatory employer, Utilicon, outside of the Union's hiring hall. In mid-August 2014, the Union discovered that plaintiff had engaged in "referral jumping" (violating the rules of the referral hall and the referral procedure) by obtaining work outside of the hiring hall procedures. A Union representative met plaintiff at the Utilicon site at that time and informed him of his referral violation. Plaintiff was required to leave the job site and threw garbage in the face of the Union official. Several days later, plaintiff visited the hiring hall to re-register, but was reminded that the positive drug test result prevented him from doing so. Plaintiff yelled at the Union officer and left. Plaintiff thereafter completed a rehabilitation program and provided his certificate.

On May 20, 2015, plaintiff was referred to employment with Sitetech, Inc. through the Union hiring hall to perform work covered by the AGC agreement. A week later, he was involved in a work place accident while operating equipment. Sitetech requested that he submit to an alcohol and drug test. Plaintiff was driven to a medical facility, but refused the test or to

6

sign a consent form for the test. Sitetech informed the Union of such and the Union informed plaintiff that he was not in compliance with the Policy. The refusal constituted a positive result. By letter of May 29, 2015, plaintiff was informed by the Union that he had three documented cases of positive drug tests and, therefore, was permanently barred from registering for work in the Union hiring hall. Plaintiff did not file a grievance regarding the permanent bar.

Plaintiff submitted his own declaration, with no attached exhibits or evidence, wherein he states the following. He is an African American male. In 2014, plaintiff filed an EEOC charge alleging that he was being discriminated against by the Union because he had complained about derogatory and racially related remarks made to him by co-workers at Glassrock. Plaintiff did not file a lawsuit because he needed to continue his employment through the Union. The Union continued its racial discrimination and retaliation against him.

Before beginning his employment at Cheiftain Trucking, plaintiff passed a drug test. But, a week later, a Union agent told him he needed to re-take it at his own expense. Plaintiff responded that he had to work to earn the money to pay for the test. As a result, the Union sent him home. Plaintiff was unable to obtain work from the Union and so contacted Utilicon- an employer he knew personally. Plaintiff was hired and began working. However, a week later, a Union agent, Bill Russell, arrived at the site and spoke to the job foreman. Russell then informed plaintiff that he could not work there and needed to put in "a 10 day referral." Russell told plaintiff to get his "black monkey ass off the machine." The next day, plaintiff went to the hiring hall to put in the referral. Plaintiff was informed by Russell that the refusal to take the drug test was considered a positive result. Plaintiff enrolled in a treatment program and presented the certificate of completion.

7

The Union then sent plaintiff to work at Precision Engineer assigned to Public Square in Cleveland. (No date is identified.) Upon arrival, Russell told plaintiff he needed to take a drug test. He did so, but before receiving the results, the job foreman told plaintiff to get off the equipment. A week later, the drug test returned negative. The next day, plaintiff was laid off by Precision Engineer. Plaintiff drove by the work site and saw white operators doing his job. Plaintiff went to the Union hiring hall and was told that although the drug test result was negative, he had been laid off because there was no work at the Public Square site.

Subsequently, the Union offered plaintiff a job with high retention lines. Plaintiff declined because he had no experience with that work. The Union referred him to a job in Sandusky[2]- 100 miles from his house. Plaintiff took the job. He was injured when a machine struck his arm, but plaintiff was told he needed to first take a drug test before receiving treatment for his arm. He passed the drug test and was then assigned to work at Thistledown. Russell then contacted plaintiff and informed him that the drug test was considered "a failure" and plaintiff was permanently banned from the Union.

After filing a second EEOC charge and receiving a Right to Sue letter, plaintiff filed this Complaint. He sets forth four claims. Count One alleges race discrimination under Title VII. Count Two alleges retaliation under Title VII. Count Three alleges a violation of 42 U.S.C. § 1981. Count Four alleges race discrimination under the Ohio statute.

This matter is before the Court upon defendant's Motion for Summary Judgment

**<u>Standard of Review</u>**

Summary Judgment is appropriate when no genuine issues of material fact exist and the

---

[2] Although not indicated by plaintiff, this is apparently the job with Sitetech.

moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993). The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d

9

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**(1) Title VII Race Discrimination[3]**

"Title VII prohibits both employers and labor unions from discriminating on the basis of race, color, religion, sex, or national origin. See 42 U.S.C. § 2000e–2(a)–(c)." *Phillips v. UAW International*, -- F.3d —, 2017 WL 1337236 (6th Cir. April 12, 2017). Plaintiff has sued the Union, not an employer. Under subsection (c), it is unlawful for unions-

> (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;
>
> (2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

§ 2000e–2(c).

As with other Title VII claims of discrimination, plaintiff must first establish a prima

---

[3] Plaintiff states in his brief that he has alleged that the Union violated Title VII by creating a hostile work environment. Plaintiff did not do so. Count One alleges only that the Union discriminated against him on the basis of his race by treating him less favorably than similarly situated white individuals. The first time plaintiff mentioned a hostile work environment was in his brief in opposition to the Motion for Summary Judgment. The Court will not address a hostile work environment claim.

10

facie case either by presenting direct evidence of intentional discrimination or by showing the existence of circumstantial evidence which creates an inference of discrimination. Under § 2000e–2(c)(1), a union can be liable for its own acts of discrimination by making the deliberate choice of refusing to process grievances involving discrimination claims, by participating in the establishment of discriminatory rules for an apprenticeship program, or by discriminating in job referrals. *EEOC v. International Association of Firefighters,* 2000 WL 33739179 (S.D. Ohio August 18, 2000). To establish a prima facie case under this "catch all" provision, a plaintiff must show he was subjected to an adverse employment action, his membership in a protected class was a motivating factor in the action, and similarly situated white employees were treated differently. *Done v. Brooklyn Hosp. Ctr.,* 2009 WL 366330 (E.D.N.Y. Feb. 12, 2009). To establish a prima facie case with circumstantial evidence in the context of a union's alleged discrimination pertaining to referrals under (c)(1) or (2), a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for a job referral; (3) he was not referred despite his qualifications; and (4) a person outside the protected class with similar qualifications was referred. *Wrobbel v. International Broth. of Elec. Workers, Local 17*, 638 F.Supp.2d 780 (E.D.Mich. 2009). To establish a prima facie case under (c)(3), a plaintiff could present evidence that the union "instigates or actively supports discriminatory acts." *Id.* But, "passivity or acquiescence in the face of discrimination by an employer is not sufficient to establish liability on the part of the union." *Id.* (citations omitted).

Once a plaintiff satisfies the prima facie case, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the action. If the defendant does so, the plaintiff must prove that the legitimate reasons offered by the defendant were in fact

11

a pretext for discrimination. *Id.*

Plaintiff argues he has direct evidence of discrimination based on statements made by Union officials and Union co-workers. Plaintiff points to the following statements in his declaration:

> The remarks that I complained about were comments made about me living in the ghetto, comments about me purchasing my food in the hood, at the two for one store, and frequently engaging in other racially related and derogatory comments. One time, a white member of The Union pulled out a fried chicken leg from his bag and told me that he brought me some lunch. Another time, when I received my paycheck, another employee told me that no black man should ever make that much money. (Plaintiff's Declaration at ¶ 5).

> While employed at Glass Rock union co-workers told me black men should not get paid as much as white men. I requested that the derogatory statements stop. (*Id.* ¶ 6).

> [Mr.Russell] also stated that Mr. Griffin needed to get my 'black monkey ass off the machine.' (*Id.* ¶ 16)

For the following reasons, this Court disagrees that these statements are direct evidence of race discrimination. The Sixth Circuit has repeatedly recognized:

> If discriminatory statements are offered as direct evidence of discrimination, those statements must come from the decisionmakers responsible for the adverse employment decision. Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself cannot suffice to satisfy the plaintiff's burden of demonstrating animus.

*Richardson v. Wal-Mart Stores, Inc.,* 836 F.3d 698 (6th Cir. 2016) (citing *Geiger v. Tower Auto,* 579 F.3d 614 (6th Cir. 2009) (internal marks omitted). Racial comments made by co-workers are not direct evidence of discrimination. *Lee v. Cleveland Clinic Foundation,* 2017 WL 244785, - Fed. Appx. - (6th Cir. Jan. 20, 2017) (citations omitted). The comments plaintiff relies on are made by co-workers. Additionally, there is no evidence that Union agent Russell made the decision to bar plaintiff from the hiring hall.

12

Nor does plaintiff set forth a prima facie case[4] of race discrimination through circumstantial evidence.

As set forth above, to set forth a prima facie case under (c)(1), plaintiff must show that he suffered an adverse employment action and that similarly situated white employees were treated differently by the Union. Plaintiff states in his brief that he suffered an adverse employment action when "he was terminated and/or banned from the union and thus banned from employment." He states he was treated differently from white Union members "in drug testing and job assignments." (Doc. 27 at 12)[5]

The undisputed evidence[6], supported by copies of the drug testing results or refusals to take drug tests, establishes that under the Policy, plaintiff was permanently banned from

---

[4] As set forth above, the prima facie case is unique based upon claims brought against a Union under § 2000e-2(c)(1)-(3). Plaintiff, however, asserts only that his prima facie case consists of the same four-part test utilized for other race discrimination claims brought against an employer. Plaintiff's cited cases are inapposite. *See, for e.g., Driver v. U.S. Postal Services, Inc.,* 328 F.3d 863 (6th Cir. 2003), wherein plaintiff brought a hybrid action under § 301 of the LMRA for the employer's breach of the collective bargaining agreement and the union's breach of duty of fair representation. *See also Robinson v. Central Brass Mfg. Co.,* 987 F.2d 1235 (6th Cir. 1993) (a § 301 hybrid action) and *Patterson v. United Steelworkers of America,* 381 F.Supp.2d 718 (N.D.Ohio 2005) (Plaintiff had brought a claim against the union for failure to file a grievance and the only issue before the court was attorney's fees.) Moreover, contrary to plaintiff's statement, the Union is not plaintiff's employer for all of the reasons set forth in defendant's reply brief. (Doc. 28 at 7-8) Most notably, the CBAs give the employer to whom an operating engineer is referred for employment, and not the Union, the sole authority to hire and fire. Plaintiff acknowledged as much in his deposition.

[5] This is the only argument plaintiff makes as to (c)(1), (2), or (3). Nor does he differentiate between the three subsections. On this basis, plaintiff asserts that he establishes a prima facie case. Plaintiff does not address pretext.

[6] Plaintiff's self-serving Declaration, unaccompanied by any evidentiary support, is an almost complete duplication of his Complaint. In fact, plaintiff's earlier deposition showed he could not support the allegations.

13

registering for work in the hiring hall because he had four positive test results. Namely, he tested positive for cocaine by Soda Construction in August 2005, he failed to take the pre-employment drug test by Ruhlin Company in August 2007, he tested positive for cocaine by Chieftain Trucking in July 2014, and he refused a drug test by Sitetech in May 2015. Thus, the ban from the hiring hall could not be considered an adverse action taken by the Union given that it was plaintiff's actions which caused the result required under the Policy contained in the CBAs. Even if it were an adverse action, there is no evidence of pretext inasmuch as the decision to ban plaintiff was required by the CBAs.

Nor does plaintiff show that non-black Union members who failed at least three drug tests were not banned from the hiring hall.[7] Plaintiff states in his declaration, "I believe The Union intentionally discriminated against me, an African American, by treating me less favorably than similarly situated white individuals. They harassed me, ignored my complaints and subjected me to numerous unwarranted drug tests." (pltf. decl. ¶ 34) However, as stated earlier, plaintiff presents no evidence of drug tests that the Union subjected him to. Rather, the copies of the drug tests and refusals to submit to drug tests show that the employer subjects the employee to drug testing. (Cianciolo aff. Exs. D, I, L, and O) In fact, the Policy makes clear that the drug testing is at the employer's discretion:

> All job sites or work areas are subject to random or massive drug screening. Any employee who is involved in an on-the-job accident resulting in an injury to a person or property or whose observed behavior raises a reasonable suspicion of probable cause of

---

[7] As with all his allegations that he was treated differently than non-protected Union members, plaintiff offers no evidence other than the averments made in his declaration. Plaintiff acknowledges in his brief that his original counsel conducted no discovery. After new counsel was obtained, a motion to re-open discovery was denied.

14

> illegal drug or alcohol use impairment while on the job site, may be required as a
> condition of continued employment to submit to a test for alcohol and/or illegal drug
> use...

(*Id.* Exs A, B, and C) Additionally, plaintiff's assertion that the Union ignored his complaints is belied by the fact that the Union filed a grievance on his behalf concerning the alleged derogatory comments referred to above and his supervisors' action in falsely accusing him of safety violations in retaliation for reporting the comments. (Taggert aff. Ex. C) The Union pursued the grievance through all steps available.

For these reasons, plaintiff cannot show a prima facie case under (c)(1).

As for establishing a prima facie case under (c)(2), plaintiff must show he was qualified for a job referral, he was not referred despite his qualifications, and a person outside the protected class was referred. Plaintiff does not specifically address the prima facie case pertaining to referrals. At most, plaintiff states in his declaration that after Precision Engineer laid him off, he drove by the job site and "saw nothing but white operators doing the job I was doing the day before when I was laid off." (pltf. decl. ¶ 25) However, plaintiff presents no evidence as to who these individuals might be or whether they had been hired by Precision Engineering through the Union hiring hall. Moreover, plaintiff agreed during his deposition that he had received numerous referrals for work assignments under the hiring hall between his employment periods with Soda, Ruhlin, Glasrock-OMI, Chieftain, Precision, and Sitetech. (pltf. depo. 112-113, 124-125, 127-129, 179-180). Plaintiff states in his 2015 EEOC charge that following the filing of his first EEOC charge, the Union failed to send him on jobs with the same frequency it sent white workers who had not filed charges, or sent plaintiff on undesirable jobs. (pltf.depo. Ex. 29) However, plaintiff does not provide evidence of any job referrals he was

15

denied but were referred to white applicants instead. Nor does he show that non-protected Union members got the more desirable jobs.

For these reasons, plaintiff cannot show a prima facie case under (c)(2).

As stated earlier, to satisfy the prima facie showing under (c)(3), plaintiff must show that the Union instigated or actively supported an employer's discriminatory acts.  Again, plaintiff does not address this subsection directly.  The Court agrees with defendant that the only basis upon which plaintiff appears to suggest that an employer may have discriminated against him due to his race is when he was laid off by Precision Engineering. As discussed earlier, plaintiff states in his declaration that Union agent Russell arrived at the job site and told plaintiff he needed to take a drug test. The day after he received his negative drug test result, Precision Engineer laid him off.  The next day, plaintiff drove by the job site and saw white operators performing the job he had been doing. (pltf. decl. ¶¶ 23, 25) However, plaintiff has no evidence- and only his own supposition- that the Union instigated or actively supported Precision's alleged discriminatory acts.[8]  In fact, plaintiff was asked at deposition, " What evidence do you have that would establish that Local 18 played a role in Precision sending you home for lack of work?" Plaintiff responded, " Sir, if you can say what role they played, okay, it really makes no difference, I mean, what role they played or not. What Local 18's job is to protect me. Local 18's job is to make sure that I am doing my job and that I am not laid off from any job for no reason, okay. That's why I pay union dues..." (pltf. depo. 277-278) And,

> Q. What evidence do you have that would demonstrate that Local 18 directed Precision to lay you off and hire a white operator in your place?

---

[8] The Court cannot even assume that Precision's decision to lay plaintiff off was based on race.

16

> A. Listen, what you don't understand is, it doesn't matter if Local 18 told them to lay me off or not. Local 18 had a responsibility to find out why I was laid off.

(pltf. depo. 284) In addition to acknowledging that he has no evidence that the Union played a role in Precision's action, plaintiff admitted he did not file a grievance over the lay-off. (*Id.* 284-285, 295-296).

For these reasons, plaintiff cannot show a prima facie case under (c)(3), and summary judgment is warranted on Count One. For the same reasons, summary judgment is warranted on Count Four which alleges race discrimination under Ohio law.[9]

### (2) Retaliation

In the absence of direct evidence, a plaintiff may establish a prima facie case of retaliation by showing that: (1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Leary v. Ford Motor Company,* 2017 WL 1829785 (W.D.Ky. May 5, 2017) (citations omitted) If the plaintiff establishes a prima facie case, the burden shifts to the defendant to rebut the presumption by articulating some legitimate, nondiscriminatory reason for its action. If defendant does so, the burden returns to plaintiff to demonstrate that the proffered reason was a mere pretext for discrimination.[10] *Id.*

Plaintiff argues the Union retaliated against him for filing his two EEOC charges by

---

[9] In general, federal and state discrimination claims are analyzed in the same manner. *Voltz v. Erie County,* 617 Fed.Appx. 417 (6th Cir. 2015).

[10] Defendant acknowledges that the same analysis applies to a claim against a union. (Doc. 25 fn 6)

17

terminating him from the Union hiring hall, disciplining him, and subjecting him to improper drug testing. (Doc. 27 at 8, 13) Moreover, plaintiff asserts that he has direct evidence of retaliation. Plaintiff states in his declaration that when he went to the Union after being dismissed from the Utilicon job, Mr. Russell told plaintiff that "if I did not like what The Union was doing I should send another letter to the EEOC." (pltf.decl. ¶ 20)

For the following reasons, plaintiff's retaliation claim fails. The Court first addresses the alleged direct evidence. As stated earlier, the employer subjected plaintiff to drug testing and not the Union. Additionally, plaintiff does not present evidence of the Union disciplining him. Therefore, the adverse action at issue was the Union decision, on May 29, 2015, to ban plaintiff from the hiring hall. There is no evidence that Russell made the decision to ban plaintiff. He did not sign the final letter. (Doc. 25 Ex. P) As discussed above, the Sixth Circuit has repeatedly recognized that statements made by non-decisionmakers, or statements by decisionmakers unrelated to the decisional process, are not direct evidence. Furthermore, the alleged statement of Russell occurred in August 2014. Thus, it was not related to the decisionmaking process. Additionally, the comment by Russell appears to be isolated. "[I]solated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of discrimination." *Hartman v. Dow Chemical Company,*. 2016 WL 4363161, - Fed.Appx- (6th Cir. August 16, 2016) (citations omitted). One comment made by a non-decisionmaker is insufficient to amount to direct evidence.

The Court then analyzes the claim through the circumstantial evidence. The Court assumes plaintiff engaged in activity protected by Title VII which was known to defendant and that defendant took an employment action adverse to plaintiff by banning him from the hiring

18

hall. However, there is no evidence of a causal connection for several reasons. First, there is no temporary proximity between the EEOC charges and the May 29, 2015 decision. Plaintiff's first EEOC charge was filed on October 13, 2013. (pltf. depo. Ex. 20) This was about one and one-half years prior to the decision. A time lag of seven months normally cannot support an inference of a causal link. *See Dicarlo v. Potter,* 358 F.3d 408 (6th Cir. 2004) Plaintiff's second EEOC charge was filed on July 21, 2015. (*Id.* Ex. 29) This was after the May 29 decision. Second, there is no evidence of any but-for connection. "The causal connection must be proven by sufficient evidence to demonstrate an inference that, had the plaintiff not engaged in his protected rights, the defendant would not have taken the adverse action." *Leary v. Ford Motor Company,* 2017 WL 1829785 (W.D.Ky. May 5, 2017) (citations omitted). The May 29, 2015 letter states, "As we had discussed you have had three documented cases of testing positive on urine drug screen/blood alcohol exams in violation of union policy. You are therefore permanently barred from registering for work in Local 18." (Doc. 25 Ex. P) As discussed at length above, the evidence is undisputed that plaintiff had positive drug tests in August 2005 and July 2014. He had two de facto failures based on his refusal to submit to drug tests in August 2007 and May 2015. (Cianciolo aff. Exs. D, I, L, and O). Thus, the Court cannot infer that plaintiff's protected activity caused his ban, but the Policy required it.

Even assuming he established a prima facie case, plaintiff cannot demonstrate pretext as to defendant's asserted non-discriminatory reason for the ban- three failed drug tests- for the same reasons discussed immediately above.

**(3) Section 1981**

"The elements of a prima facie case as well as the allocations of the burden of proof are

19

the same for employment claims stemming from Title VII and § 1981." *Hawkins v. The Center for Spinal Surgery*, 2017 WL 1131692 (M.D. Tenn. March 27, 2017) (quoting *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004)). Therefore, for the reasons stated above with regard to the Title VII claims, this claim is dismissed as well.

### **Conclusion**

For the foregoing reasons, defendant's Motion for Summary Judgment is granted.

IT IS SO ORDERED.

                 /s/ Patricia A. Gaughan
                 PATRICIA A. GAUGHAN
                 United States District Judge

Dated: 5/30/17